**CASTLE HEIGHTS, INC.,**
v.
**UNITED STATES of America.**

**M. M. BULLARD and Dorothy Bullard**
v.
**UNITED STATES of America.**

**Civ. A. Nos. 1813–1816.**

United States District Court
E. D. Tennessee,
Northeastern Division.

May 25, 1965.

Gayle I. Malone, Trenton, Tenn., for plaintiffs.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., H. Stennis Little, Atty., Tax

Division, Dept. of Justice, Washington, D. C., for defendant.

ROBERT L. TAYLOR, Chief Judge.

Before the Court for consideration is defendant's motion for a directed verdict which was renewed within ten days after a mistrial was declared due to the inability of the jury to agree. In support of the motion, it is urged that the case involved questions of law solely for the determination of the Court and that the evidence failed to create an issue for the determination of the jury.

The actions were filed by Castle Heights, Inc., (hereafter called Castle), a Tennessee corporation, with principal offices at Newport and M. M. Bullard and wife, Dorothy Bullard, to recover income taxes which they claim were wrongfully collected from them by the Government. Castle seeks a recovery of $11,407.06 covering its fiscal years ending April 30, 1958, April 30, 1959 and April 30, 1960, and Bullard and wife seek a recovery of $1,305.91 for the calendar year 1959, plus interest.

The controversy stems from the action of the Commissioner of Internal Revenue in disallowing certain interest payments made by Castle to Bullard as operating expenses of Castle and in disallowing for tax purposes the cost price of lots sold by Castle in a residential subdivision organized by Castle and established in Cocke County, Tennessee at their cost to Bullard, the transferor of the lots to Castle.

The Internal Revenue Service did not recognize the transfer of the property by Bullard to Castle for purposes of gain or loss as it claimed that the transfer did not create a debtor-creditor relationship between Bullard and Castle, but constituted a contribution by Bullard to the capital of the corporation. The Bullards and Castle claim that the Internal Revenue Service acted arbitrarily in refusing to recognize the transfer. The Government contends that the alleged transfer was in reality a contribution to capital and that under Section 351 [1] of the Internal Revenue Code a taxpayer is permitted to transfer property to a newly formed corporation in exchange for its stock or securities when immediately after the exchange such person or persons are in control of the corporation, without recognition of gain or loss. In such a transaction it argues the basis of value of the property in possession of the transferee shall be the same as it would be in the hands of the transferor. (Section 362 [2] of the Internal Revenue Code.)

1. "§ 351. Transfer to corporation controlled by transferor

"(a) General rule.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

"(b) Receipt of property.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

"(1) gain (if any) to such recipient shall be recognized, but not in excess of—

"(A) the amount of money received, plus

"(B) the fair market value of such other property received; and

"(2) no loss to such recipient shall be recognized."

2. "§ 362. Basis to corporations

"(a) Property acquired by issuance of stock or as paid-in surplus.—If property was acquired on or after June 22, 1954, by a corporation—

"(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

"(2) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands

If the transfer was a capital contribution, the Commissioner's action in disallowing interest deductions by Castle and disallowing the cost price of the lots to Castle was proper. On the other hand, if the transfer created a debtor-creditor relationship between Bullard and Castle, the action of the Commissioner in disallowing the interest paid by Castle to Bullard as an operating cost and in fixing the cost of the lots upon the same basis as the cost to Bullard was improper. The Commissioner treated the payments to Bullard by Castle as dividends.

On April 29, 1957, Castle was chartered as a Tennessee corporation and was capitalized at $1,000.00, consisting of ten shares of common stock having a par value of $100.00 each. The ten shares were issued to Bullard in consideration of the payment of $1,000.00.

On May 20, 1957, Bullard conveyed to Castle 37.2 acres of what was formerly farm land for the price of $80,000.00 evidenced by ten notes bearing 4% interest on the principal amount of $8,000.00 each, the first of which was to become due and payable on May 20, 1958 and one note to become due and payable on the 20th day of May of each year thereafter until all were paid.

Bullard contends that he had been advised by two real estate men that his farm land was suitable for subdivision purposes and that competent counsel advised him to form a corporation and to permit the two real estate men to handle the project since he did not desire to go into the real estate business. After the corporation was organized, it proceeded to subdivide the land and get it ready for sale to customers. Bullard had

some farm machinery which he loaned to it and which was used to grade the land, fill gullies, install curbs, gutters and water lines, plant trees and grass as well as fertilize the grass. Other equipment was leased to Castle to complete the land improvements prior to actual sale.

About thirty-two or thirty-three of the lots were sold out of a total number of between fifty-seven or fifty-eight at an average price of $2,000.00 each.

The taxpayers claim that two of the notes have been paid while the Government insists that only one was paid and that it was not paid until 1959 although it was due on May 20, 1958; that no further payments have been paid on the notes since that time notwithstanding the fact that the Notes Payable Account was reduced to $64,000.00 on the books. The Government says that the second note was shown to have been paid through bookkeeping manipulations of the corporations.

The corporation has suffered a loss on its books in each of the seven years since it was formed. Interest was paid on the notes the first two years and partially paid in the third year over the seven year period. No dividends were paid. Development costs amounted to around $20,000.00 during the first year of the corporation's existence. During the period that the notes and interest have been in default other creditors have been paid by Castle. The $1,000.00 paid-in capital was inadequate for Castle to develop the property. The payment of the notes was dependent completely upon the profits derived from the sale of the lots. The payment of the notes depended upon the success of the operation.

of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

\* \* \* \* \*

"(c) Special rule for certain contributions to capital—

"(1) Property other than money.— Notwithstanding subsection (a) (2), if property other than money—

"(A) is acquired by a corporation, on or after June 22, 1954, as a contribution to capital, and

"(B) is not contributed by a shareholder as such, then the basis of such property shall be zero."

The evidentiary facts are not in dispute. Some of these facts are:

(a) Bullard was in complete control of the corporation.

(b) The formation of the corporation and transfer of the land were independent steps comprising a single composite transaction.

(c) The only hope that Bullard had in receiving payment of the notes depended upon the success of the subdivision.

(d) Bullard transferred land from his direct ownership to his indirect ownership in order to participate in the earnings of the real estate venture which he promoted.

(e) Bullard never intended to force payment of the notes if such action would impair the credit rating of Castle or force Castle into bankruptcy.

(f) Payment of notes was dependent upon profits from the sale of lots from the subdivision.

(g) Bullard's transfer of farm land to Castle was at the risk of a successful operation.

(h) Sale of lots in 1958 amounted to $16,300.00; 1959 $23,205.00; 1961 $12,200.00; 1962 $3,250.00; 1963 No sales; 1964 $2,500.00.

(i) Profit and loss sheets show losses for each year.

■ The determination whether the transfer was a contribution to capital or constituted a debtor-creditor transaction depends largely upon the intent of the parties at the time the conveyance was made and in arriving at the intent, a number of factors may be considered (See Royalty Service Corp. v. United States, D.C., 178 F.Supp. 216, 220):

(1) Whether the promissory notes which bore interest had a reasonably close fixed maturity date.

(2) Whether the obligation of the corporation to pay was positive and unconditional.

(3) Whether the alleged debt of the corporation to Bullard was subordinated to that of any other creditors.

(4) Whether the corporation inordinately or unduly postponed the payment of the notes.

(5) Whether the interest was paid regularly when due; and whether the rate of interest was fixed in the instrument.

(6) Whether a business purpose other than tax reduction was served by the execution of the notes.

(7) Whether the parties intended to create a debtor-creditor relationship.

(8) The ratio of the paid-in capital to the debt of the corporation.

(9) Whether the notes were secured.

(10) Whether the noteholder was also a stockholder and possibly the controlling stockholder.

These factors are suggestive only and are not necessarily exclusive. No single factor is decisive. Moughon v. C. I. R., 329 F.2d 399, 401 (C.A.6).

■ In determining whether payment by a corporation to holders of notes constitutes dividends or payments on debt for income tax purposes, each case depends for its solution upon its own peculiar facts and whether a debtor-creditor relationship exists depends upon real intentions of parties which may be established by independent evidence. Gooding Amusement Corporation v. Commissioner of Internal Revenue, 6 Cir., 236 F.2d 159. This intent is not necessarily determined by the form of the transaction, but by its substance, or by what was actually done. Bauman v. United States, 106 F.Supp. 384, 387 (D.C.Mo.).

■ The determination of the nature of the transaction is not a subjective one based upon the intent of the parties, but is to be ascertained from an overall evaluation of the nature of the debt which is based upon many factors. Camp Wolters Enterprises v. Commissioner of Internal Revenue, 230 F.2d 555 (C.A.5); Rowan v. United States, 219 F.2d 51, 54 (C.A.5); Sun Properties v. United States, 220 F.2d 171, 175, 176 (C.A.5).

The case of Aqualane Shores, Inc. v. Commissioner of Internal Revenue, 269 F.2d 116 (C.A.5) involved facts similar to those in the case under consideration. In that case, a father and two sons, who were landscaping and grading contractors, operated as a partnership in the name of Walker Construction Company. In May, 1949, the partners acquired approximately 175 acres of land at Naples, Florida, at a price of something more than $69,000. Purchase money mortgages were given for a substantial portion of the price. In December, 1949, the Walkers caused the taxpayer, Aqualane Shores, Inc., to be incorporated under the Florida law. Ten shares of stock were issued to each of the three Walkers for $320.00 per share. The Walkers conveyed the land to the corporation and executed an agreement in which it was stated that the consideration for the transfer was $250,000.00, of which $9,000.00 was paid in cash, an unpaid amount of $49,128.88 on the mortgages was assumed, leaving a balance of $191,871.12 payable in five equal annual installments bearing interest at 4%.

The land was, for the most part, mangrove swamp. It was the plan of the Walkers to develop the property as a residential subdivision. The partnership reported the transfer to the corporation as an installment sale which resulted in a long-term capital gain. The corporation borrowed money and gave mortgages as security. The father made two unsecured loans, each in the amount of $10,000, to the corporation. During the years 1950, 1951 and 1952, tax returns computed gains from the sale of lots on the basis of an overall land cost of $250,000. The Commissioner determined that the basis of the property to the corporation taxpayer was $69,291, the same as the basis of the Walkers. Deficiencies were assessed. The Tax Court, 30 T.C. 519, sustained the Commissioner. The Court sustained the Tax Court.

The case of Bruce v. Knox, 180 F. Supp. 907 (D.C.D.Minn.) likewise involved facts similar to the facts involved in the instant case. Wallace T. Bruce, one of the taxpayers, received as a gift from his mother two-third interest in an undivided 37-acre tract of land known as Cedar Lake land, and later purchased the remainder for $4,500. Bruce and his wife were in the business of constructing dwellings as partners. They formed a corporation known as the Bruce Construction Company to take over this business and were its sole stockholders. The Cedar Lake land remained undeveloped until 1952. With the idea of subdividing the property, Bruce caused a corporation, the Wallace T. Bruce, Inc., (a taxpayer in this suit) to be formed for the purpose of developing the land in question. This corporation issued 110 shares of stock to Bruce, its only stockholder, for $11,000. Bruce then transferred the Cedar Lake land to Bruce, Inc. for a consideration of $198,000.00, payable $10,000 down, $10,000 on September 30, 1952 and $10,000 quarterly thereafter until the principal and interest at the rate of 4½% on the unpaid principal was paid. On July 3, 1952, a contract for the construction of dwellings was entered into between Bruce Construction Company and Bruce, Inc., and the former was to receive from Bruce, Inc. as compensation its costs on each dwelling and, in addition, its expense incurred in the improvement of the entire tract. The agreement also provided that Bruce Construction Company was to receive $1,100 for each dwelling completed and sold. Bruce, Inc. bore the costs of subdividing; grading and selling.

As noted, Bruce paid $11,000 for his stock, of which amount $10,000 was immediately returned as the down payment. Thus Bruce, Inc. had only $1,000 cash when the development of the tract started. Bruce, Inc. had no money on September 30, 1952 when the first payment was due and no actual cash payments were ever made by Bruce, Inc. to Bruce on the land contract. Bruce, Inc. gave its demand note for $40,000.00 to Wallace T. Bruce on July 1, 1953. This note bore interest in excess of 4½%. Another demand note for $38,400.00 was issued to Wallace T. Bruce on September

1, 1953 by Bruce, Inc. at a higher rate of interest. The notes were used by Bruce in obtaining loans at his bank. On June 30, 1954 Bruce Construction Company gave Bruce, Inc. its note for $101,355.39. This note was distributed to Wallace T. Bruce in partial satisfaction of the moneys allegedly due him under the purchase agreement, was subsequently returned to the Construction Company in connection with a transaction between Bruce and the Construction Company. On the same day of this note transaction, Bruce, Inc. deeded to Wallace T. Bruce a portion of Cedar Lake land which Bruce was to utilize for the purpose of a shopping center and in connection with this transaction Bruce, Inc. received a credit of $11,350.50 on the so-called purchase agreement. No further payments were made to Bruce until June 30, 1955. At that time there was eliminated a liability of the Bruce Construction Company to Bruce, Inc. in the amount of $29,569.60. That amount was applied by Bruce, Inc. in partial satisfaction of the alleged contract price due Wallace Bruce and as a part of the transaction, Bruce Construction Company cancelled an indebtedness of $29,569.60 due it from Wallace T. Bruce. No other credits were made on the Bruce, Inc. purchase contract during the year ending June 30, 1956. By credits to Wallace T. Bruce by Bruce, Inc. the total amount due on the purchase contract was satisfied before the end of 1956. No formal declaration of dividends was declared by Bruce, Inc.

The Commissioner determined that Bruce, Inc. was not entitled to interest deductions payable under the purchase contract, holding that payments to Bruce were dividends for a contribution to capital. In arriving at the profit on the sale of lots, the cost basis of the Cedar Lake tract was, according to the Commissioner, the cost or basis in the hands of Wallace T. Bruce, plus the amount which Bruce, Inc. had spent for capital improvements. The Commissioner also held that the payment of principal and interest under the purchase agreement constituted taxable dividends to Bruce.

Bruce and his wife sought a refund of $10,581.14 for taxes paid for the calendar year 1955. Bruce, Inc. sought a refund of $908.32 for taxes it was required to pay for the tax year ending June 30, 1956. Suit was instituted to recover the amounts which taxpayers claimed they were required to pay. Taxpayers contended that the Commissioner may not arbitrarily determine that an investment in a company is a mere contribution to capital when the parties intended the transaction to constitute an indebtedness.

The Court in ruling against the taxpayers and in affirming the action of the Commissioner, observed that Wallace T. Bruce was in complete control of the corporate affairs of Bruce, Inc.; that he launched the corporation with a capital $11,000 and that the formation of the corporation and the transfer of the land was mutually dependent steps comprising a single composite transaction; that the only hope he had of obtaining any return on the so-called purchase agreement was the success of the development and sale of the lots that were subdivided; that the transfer of the property to Bruce, Inc. was an integral part of the plan and scheme on the part of Wallace T. Bruce to obtain thereby an assured participation in the fruits of the development and sale of the lots; that without success of the proposed venture there was no possibility of the sole stockholder's receiving the payments scheduled in the purchase contract. The Court pointed out that one of the controlling factors in determining whether the transfer of property to a "thin corporation" constitutes a bona fide sale of the property or a mere contribution to capital is the anticipated source of the payments to the stockholder. It was also pointed out that the ratio of the purported indebtedness of the corporation to its capital was 17 to 1. This was a marked imbalance. The amount of the obligation of Bruce, Inc. as compared to its assets was even more out of line in that

it owed $188,000 after issuing $11,000 of its stock to Bruce and then returning $10,000 of the consideration as the initial payment on the contract of purchase. The ratio of indebtedness to assets was 188 to 1. Such imbalance indicated that the stockholder could not expect payment out of the then existing assets of the corporation.

See also: Kolkey v. C. I. R., 254 F.2d 51, 54 (C.A.7).

See a decision of the Supreme Court of Tennessee in a somewhat comparable case, R. C. Owen Company v. Butler, 387 S.W.2d 830.

 In our case, the ratio of indebtedness to equity capital was 80 to 1. Outside of the land, the only asset of the company was the $1,000 cash paid in for the exchange of the ten shares of capital stock. The $1,000 was insufficient to develop the land for sale for residential purposes. As previously pointed out, nearly $20,000 was spent for development purposes during the first year of the corporate existence. Without success of the development there was no hope of paying the $80,000.00 indebtedness. Bullard was the sole stockholder of the corporation and the owner of the $80,-000.00 of notes secured by trust deed on the land. As owner of the corporation and owner of the mortgage on the land, he dealt with himself. The reasonable inference is that he would not have enforced payment of the notes against the land as and when they became due if in doing so it would have impaired the credit of the corporation or caused it to go into bankruptcy. In fact, he did not enforce the notes or the payment of interest thereon when and as they became due, but subordinated them to the claims of unsecured creditors.

These circumstances indicate strongly and the Court concludes that the transfer of the 37.2 acres of land by Bullard to Castle was a contribution to capital as distinguished from a debtor-creditor relationship.

In the light of this holding, it is not necessary to pass on the question whether the notes given by Castle to Bullard for the transfer of the undeveloped real estate were equity securities within the meaning of Section 351 of the Internal Revenue Code.

Present order in conformity with the views herein expressed.