FORESUN, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91178.  Filed February 28, 1964.

*Richard Katcher*, for the petitioner.
*Eugene S. Linett*, for the respondent.

---

OPINION

*Issue 1*

The issue is whether petitioner is entitled to deduct the annual payments of $12,000 made to Ada as interest. The answer to this question depends upon whether the transaction whereby Ada transferred the property to petitioner was a sale as contended by petitioner or was a contribution to capital as contended by respondent.

There is no question here with respect to the *form* of the instruments involved. Respondent recognizes that the conveyance by Ada to petitioner was in the form of a sale of the property to petitioner and that the note and mortgage given by petitioner to Ada were in form an ordinary promissory note and mortgage. The record also shows that the transaction was recorded on the books of petitioner and Ada as a sale of property in return for a note and mortgage. Cf. *Gooding Amusement Co.*, 23 T.C. 408, 418 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956).

It is respondent's position that in spite of the clear form that the substance of the transaction was not a sale but was rather a contribution by Ada to petitioner's capital. Respondent contends that Ada did not intend to create a bona fide debt as between herself and petitioner, but intended to embark upon petitioner's corporate adventure, taking the attendant risks of loss.

There is no one factor which is determinative in resolving the question here presented; each case must be determined by weighing the facts peculiar to it. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1946). There have been numerous decided cases involving whether purported sales of property or loans were in fact contributions to capital and various criteria have been pointed out as guidelines in determining whether the transaction is in substance what it purports in form to be. The name given to the instrument is not conclusive but is to be considered along with other facts. Presence or absence of a maturity date for the indebtedness, the right of the creditor to enforce the payment of principal and interest, participation in management, whether the creditor subordinates his debt to those of the other corporate creditors, whether the corporation is adequately capitalized, identity of interest between creditor and stockholders, whether the advance was at the time of the organization of the corporation, and the ability of the corporation to obtain loans from outside lending institutions, are all among the factors to be considered in determining the ultimate fact. *O. H. Kruse Grain & Milling* v. *Commissioner*, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court; *Wilbur Security Co.*, 31 T.C. 938 (1959), affd. 279 F. 2d 657 (C.A. 9, 1960); and *Clyde Bacon, Inc.*, 4 T.C. 1107 (1945). In the application of these criteria, it is the intent of the parties which is determinative, but this intent must be gleaned from consideration of all pertinent factors in the case. *Isidor Dobkin*, 15 T.C. 31, 33 (1950), affd. 192 F. 2d 392 (C.A. 2, 1951).

Upon consideration of all the facts in the instant case, we conclude that the purported sale by Ada to petitioner was in substance nothing more than a contribution to capital. Petitioner states, "the only conceivable factor missing from this transaction is that petitioner has not made any principal payments on the note." However, on the facts of this case, we consider this failure to make principal payments to be very significant. Despite the testimony of Ada and her son-in-law, Arnold W. MacAlonan, we do not believe that there was ever any intention to make any payments on the principal of the purported note. From the facts of this case, it seems apparent that the shifting of property and papers was nothing more than a transparent tax-

savings device to generate interest deductions and a stepped-up basis for the petitioner. The purported transactions give off an unmistakably hollow sound when tapped.

In 1944, Ada acquired the property from Stalwart, a corporation controlled by her husband and other family members. For the period July 7, 1944, to September 10, 1949, Stalwart paid Ada a yearly rental of $20,400 per year. Petitioner asserts that in 1949 Ada "was desirous of selling the Osborn property to secure for herself a regular source of income during her lifetime and, because of her ill health, to relieve herself of the burdens of managing the property," so that Ada sold the property to petitioner.

There are a number of infirmities in the argument petitioner seeks to base on the foregoing assertion. It is difficult to understand what managerial problems could be involved in leasing property to a corporation controlled by Ada's family in view of the close working relationships she had with them, and there is no evidence of such difficulties. But even assuming this claim to be true, we fail to see how Ada could be relieved of any financial problems by selling the property. If petitioner had really intended to repay the principal amount to her, any repayments would have required her to reinvest in something else that would also give her the secure income she purportedly sought. We also find it difficult to see how Ada could have had any more security than by leasing the property to Stalwart. It would appear that Ada's secure income could only be maintained under the purported sale if no payments were made on the principal of the note and only "interest" payments were made.

The downpayment of $25,000 gave some semblance of bona fides to the transaction; however, we think this payment was mere "window dressing." Petitioner had to borrow the money and give a first mortgage on the property, thus delaying any principal payments to Ada for 5 years, by means of which her "secure income" was preserved for an additional length of time. Furthermore, the presence of consideration need not preclude a contribution to capital. Cf. *Commissioner* v. *McKay Products Corp.*, 178 F. 2d 639 (C.A. 3, 1949), reversing 9 T.C. 1082 (1947).

As for Stalwart's sudden need for working capital in 1953 being the reason for subrogating Ada's mortgage a second time, we think this was again one of those transactions with a distinctly hollow ring, done primarily to further postpone the principal payments on Ada's "note." Stalwart began putting these improvements on the property shortly after the purported sale in 1949, establishing a plausible reason for trying to get the property out of Ada's estate. With the improvements, the property might have a value of as much as

$500,000 in Ada's estate. Under the purported sale, Ada would only be holding, at most, a $200,000 note. In addition, if no "principal payments" were made, Ada would get her "secure income."

It seems more than coincidental that Stalwart would need working capital at just about the same time as Foresun's $25,000 note to National City Bank was almost paid off. The purported sale of the leasehold assets to petitioner appears to be nothing more than a cog in the overall plan.

The 1953 transaction could have done nothing but prejudice Ada's position. Petitioner argues that she had increased security because of the leasehold improvements. However, since these were presumably fixtures, they were already security. *Teaff* v. *Hewitt*, 1 Ohio St. 511 (1853); *Roseville Pottery* v. *County Board of Revision*, 149 Ohio St. 89, 77 N.E. 2d 608 (1948). This is but another indication that Ada was willing to, and in fact testified that she would, go through the same subordination if necessary, to help petitioner and/or Stalwart.[1]

Petitioner has made much of the fact that Ada was not a shareholder. Petitioner argues that the cases relied on by respondent all involved closely held corporations where shareholders made advances to a controlled corporation. This argument has been decided adversely to petitioner in another context. In *Brown Shoe Co.* v. *Commissioner*, 339 U.S. 583 (1950), the Supreme Court decided that persons other than stockholders could make contributions to capital, a principle now codified in section 362(c) of the 1954 Code. See also *Edwards* v. *Cuba Railroad*, 268 U.S. 628 (1925); *Liberty Mirror Works*, 3 T.C. 1018, 1025 (1944); *Commissioner* v. *McKay Products Corp.*, *supra; Zephyr Mills, Inc.* v. *Commissioner*, 279 F. 2d 494 (C.A. 3, 1960), affirming per curiam a Memorandum Opinion of this Court; *Veterans Foundation*, 38 T.C. 66 (1962), affd. 317 F. 2d 456 (C.A. 10, 1963). In the instant situation, Ada's dealings with petitioner indirectly benefited her in the same manner as the "contributors" derived benefits in the above-cited cases. Her testimony clearly indicates that she placed the business interests of peti-

---

[1] When asked why she was confident that the security for her second mortgage was adequate, she replied:

Well, knowing the company as they were, I felt I would be sure that I would get it [the principal amount] * * *

\*          \*          \*          \*          \*          \*          \*

Well, it was just my trust I guess.

tioner and Stalwart foremost as long as she received her steady income.

If we look solely at the "note" and nothing else, it appears that the "note" has a reasonably certain maturity date. However, we do not believe that petitioner had any real intention of making any "principal payments," as evidenced by the subsequent extensions granted to petitioner by Ada. The high ratio of debt to equity lends additional support to respondent's contention that the transactions in question were contributions to capital rather than bona fide loans. Petitioner argues that cases involving "thin capitalization" are not in point because Ada was not a shareholder. Again we point out that this is not a necessary requirement. Petitioner would have us treat Ada as an unrelated third party acting in her own best interest. While it is true that transactions are not to be disregarded merely because of a family relationship, such relationship is a potent reason for giving close scrutiny to the transaction. *Sun Properties* v. *United States*, 220 F. 2d 171 (C.A. 5, 1955). The real question is whether the transaction was what it purported to be, regardless of the identity of the parties.

Petitioner argues that subordination alone is not sufficient to convert debt into capital. With this proposition we agree. However, it is a factor to be considered. It is true that there was no subordination to general creditors, but this does not tell the entire story. Under petitioner's operation, in which it was little more than a rent collector, there were no general creditors of any significance. Thus, petitioner's day-to-day operations could be carried on without fear of reprisal by general creditors. Petitioner's only expenses aside from "interest" and depreciation, were taxes, insurance, and office expense, the total of which did not exceed $8,000 in any year before us. Thus, Ada was really in the position of being a preferred shareholder, not a creditor. See *United States* v. *Title Guarantee & Trust Co.*, 133 F. 2d 990, 993 (C.A. 6, 1943). Before receiving the property from Stalwart in 1944, she was a preferred shareholder of Stalwart; now she is in effect a preferred shareholder of petitioner, receiving a steady income from her "sale" of the property to petitioner. If petitioner were dissolved and there were any assets left after the first mortgage was paid, Ada would receive the remainder, up to the amount of her investment. She was also assured of a yearly payment on her investment. There is no question that under the "mortgage" and "note" Ada could have enforced her "debt," but we

do not believe she ever would have done so. The potential beneficiaries of her estate were the same persons who would benefit from her "loan" to petitioner, and we accord little weight to Ada's testimony that she intended to have her estate enforce this "debt," especially if this would be to the detriment of the persons or corporations involved here. Cf. *Gooding Amusement Co.*, *supra* at 418–419.

Petitioner's reliance on our decision in *Warren H. Brown*, 27 T.C. 27 (1956), is misplaced. The factors which distinguished that case from *Gooding Amusement Co.*, *supra*, are not present here. In *Brown* all installments due had been paid, an underlying independent business purpose was present, and there was a low debt to equity ratio.

After a consideration of all the facts, we are led inescapably to the conclusion that Ada did not "sell" anything to petitioner but in fact made a contribution to capital.

## Issue 2

Petitioner contends that it is entitled to deduct as interest the amounts paid to the individual noteholders. Petitioner's argument is substantially the same as in Issue 1: that three of the individual noteholders were not shareholders and that the "loans" were evidenced by demand notes. Respondent contends that the "loans" were in fact contributions to capital.

Petitioner could not borrow any more money from lending institutions and consequently had to rely on the family members for additional capital. After almost 10 years no payments have been made on these notes other than purported "interest" payments. These notes are payable on demand, not at a fixed maturity date. Essentially, the daughters knew nothing about the "loans" other than that they were made on the advice of their husband-stockholders. Their testimony was that they would not enforce their obligation if it would be detrimental to the company. Again, we note that the fact the three daughters were not denominated "shareholders" is not controlling.

While it is true that there is no rule which permits the Commissioner to dictate what portion of a corporation's operations shall be provided for by equity financing rather than by debt, it is equally true that what was intended is a question to be decided from all the facts. Based upon the record, we hold that the advances by the individual noteholders were in fact contributions to capital. Accordingly, respondent's determination on this issue is sustained.

*Issue 3*

In an amended answer, respondent claimed that petitioner's basis in the property for depreciation purposes should be Ada's basis of $27,500 rather than the $218,025 "sale" price used by petitioner. Having found that Ada made a contribution to capital rather than a sale, we agree with respondent. Secs. 114(a), 113(a)(8)(B), and (b), I.R.C. 1939.[2]

*Decision will be entered under Rule 50.*

---

[2] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(a) BASIS FOR DEPRECIATION.—The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

\*    \*    \*    \*    \*    \*    \*

(8) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If the property was acquired after December 31, 1920, by a corporation—

\*    \*    \*    \*    \*    \*    \*

(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor \* \* \*

\*    \*    \*    \*    \*    \*    \*

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.