GYRO ENGINEERING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gyro Engineering Corp. v. Commissioner
Docket Nos. 4643-66, 1798-70.
United States Tax Court
T.C. Memo 1974-288; 1974 Tax Ct. Memo LEXIS 31; 33 T.C.M. (CCH) 1343; T.C.M. (RIA) 740288; November 12, 1974, Filed. *31 1. Petitioner purchased apartment properties from its controlling stockholder. The Commissioner contended that the sale was a sham transaction, but this contention was rejected by the Ninth Circuit. Held: The decision by the Ninth Circuit does not preclude the Commissioner from arguing now that the basis of petitioner in the apartment properties is less than the purchase price because that price included unstated interest. Held, further: The respondent has failed to carry his burden of proving that the stated sale price did not establish the petitioner's basis in the apartment properties. 2. Petitioner incurred expenses for the acquisition of citrus trees. Held: The expenditures must be capitalized. 3. The controlling stockholder transferred a ranch to petitioner. Held: The transfer was a contribution to petitioner's capital so that petitioner may not use a stepped-up basis for depreciation purposes and may not deduct as interest certain payments made to the controlling stockholder. 4. Additions were made to the main residence and the foreman's residence at petitioner's ranch. Held: The amounts that constitute business expenditures of a capital nature are determined. *32 5. Petitioner sustained casualty losses from flood damages to apartment properties, a dam and citrus trees. Petitioner also claimed a theft loss of a generator. Held: The amount of the losses from floods is determined. Held, further: Petitioner has not adequately proven a theft loss. 6. Petitioner incurred expenses for concrete to repair a crossing over a river damaged by flooding and for tractor work on leased land to change the course of the river. Held: Petitioner is entitled to a deduction for the expenses of the concrete. Sec. 165. Held, further: The expenses of the tractor work must be capitalized over the term of the lease. 7. Petitioner incurred expenses for oil and gas products and for vehicle repairs. Held: The amounts of deductions allowable regarding these expenses are determined. 8. Petitioner incurred expenses for research activities conducted by its controlling shareholder. Held: These expenses are not deductible under either sec. 165 or sec. 174. 9. Petitioner paid rent to its controlling stockholder for the use of part of a home he rented. Held: Petitioner has failed to prove that it is entitled to a deduction for rent. 10. Petitioner failed *33 to file an income tax return in a timely manner. Held: Petitioner is liable for the addition to tax provided by sec. 6651(a). William Lee McLane and Nola McLane, for the petitioner. Marion Malone, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in the income tax of petitioner for the years and in the amounts as follows: Docket No.
Year Ended
Deficiency
Addition to Tax Sec. 6651(a) 4643-66
Oct. 31, 1961
$23,744.42
4643-66
Oct. 31, 1962
42,291.12
4643-66
Oct. 31, 1963
43,452.70
$8,690.54
1798-70
Oct. 31, 1964
27,709.25
1798-70
Oct. 31, 1965
23,920.83
1798-70
Oct. 31, 1966
18,711.44
1798-70
Oct. 31, 1967
36,896.58
1798-70
Oct. 31, 1968
53,003.52
The issues remaining for decision are: 1. What is petitioner's basis in apartment properties that were transferred to it by its controlling stockholder; 2. Whether expenses incurred with respect to the acquisition of citrus trees should currently be deducted or capitalized; *35 3. Whether the transfer of a ranch to petitioner by its controlling stockholder was a sale, a contribution to capital or a sham transaction for tax purposes; 4. Whether expenditures for additions to buildings at the ranch are personal or business expenses; 5. Whether certain alleged casualty losses were incurred and if so what is the amount of those losses; 6. What is the proper tax treatment of expenses that petitioner incurred for tractor work to change the course of a river and for the pouring of concrete to repair a river crossing; 7. What amounts is petitioner entitled to deduct as business expenses for oil and gas products and for vehicle repairs; 8. Whether petitioner is entitled to deduct under either section 162 or section 174 expenses incurred with respect to research activities conducted by petitioner's controlling stockholder; 9. Whether petitioner is entitled to deduct rent paid to its controlling stockholder for use of part of a home rented by him; and 10. Whether petitioner is liable for the addition to tax pursuant to section 6651(a) for failure to file a timely return. FINDINGS OF FACT General Some of the facts have been stipulated and *36 are found accordingly. The petitioner, Gyro Engineering Corporation (sometimes referred to as Gyro), is a California corporation, which was doing business in the State of California at the time of the filing of its petition in this case. It filed its Federal income tax returns for the taxable years in issue with the district director of internal revenue, Los Angeles, California. The petitioner maintains its books and records on the cash method of accounting. The petitioner was incorporated on October 9, 1952. Upon petitioner's incorporation, Chris Mowry (hereinafter referred to as Mowry) became its president and continued as president until the present time. Chris Mowry holds 4,950 shares of the 10,000 shares outstanding. His wife, Natalie Mowry, holds 550 shares, while his minor son and minor daughter hold 2,000 shares and his brother holds 2,500 shares. The petitioner originally was engaged in research on gyroscopes and gyrotesting equipment. This business did not succeed and Gyro became inactive until January 1, 1959. Basis in Certain Apartment Properties On January 1, 1959, Gyro entered into a Sales and Purchase Agreement with Chris and Natalie Mowry whereby Gyro *37 purchased three parcels of apartment properties known as the Tropics, the Carousel, and the Orange Grove Circle Apartments. The agreement provided for a total purchase price of $3,164,000. On its Federal corporate income tax returns, Gyro claimed depreciation on the three apartment complexes on the basis of an allocation of the stated purchase price of $3,164,000 between land and depreciable property, using a twenty year remaining useful life from January 1, 1959. Based on its determination that the sale was not bona fide, the Commissioner allowed a depreciation deduction only to the extent of the Mowrys' remaining undepreciated basis in the buildings and equipment. The petitioner paid the deficiency and brought suit for refund in Federal district court on August 2, 1965. In the district court proceeding, the Government, in the pretrial conference order, submitted the following issues of law to the court: (1) Whether Gyro Engineering Corp. is entitled to depreciate the apartment buildings and equipment thereon acquired from Chris and Natalie Mowry on the cost basis reflected in the agreement of sale thereof (Exhibit 4) or whether the Gyro Engineering Corp. should use the *38 transferors' basis therefor? (2) For purposes of decision of defendant's question of law (1), supra, was the transfer of the Tropics, the Carousel, and the Orange Grove Circle Apartments a bona fide sale or a sham transaction? (3) For purposes of defendant's foregoing question of law (1), assuming the transfer was not a bona fide sale and was a sham transaction, should the transfer of the Tropics, the Carousel, and the Orange Grove Circle be deemed a contribution to the capital of Gyro Engineering Corp.? A non-jury trial was held during November 1966, in the United States District Court for the Central District of California. On March 22, 1967, the court issued an order in which it concluded that the transfer from the Mowrys to Gyro of the apartment house was a sham, without substance, and therefore for income tax purposes was merely a contribution to the capital of Gyro. On October 19, 1967, the court in Gyro Engineering Corp. v. United States, 276 F. Supp. 454 (C.D. Cal., 1967), issued its judgment based on its decision that the purported sale was a sham. Gyro appealed to the United States Court of Appeals for the Ninth Circuit from this judgment. Rejecting *39 the conclusion of the district court that the transaction was little more than "a paper tax device of "gimmicks"" and therefore in reality a contribution to capital, the court of appeals in Gyro Engineering Corp. v. United States, 417 F.2d 437 (C.A. 9, 1969), held that the transaction was a sale in form and in substance. The judgment of the district court was reversed and remanded with direction to enter judgment for Gyro consistent with the conclusions of the court of appeals. Upon remand, the district court directed the parties to prepare a stipulation upon which a new judgment could be entered. The parties made computations and submitted a new stipulation to the district court. The computations used as a basis for depreciating the three apartment complexes were the same figures used by Gyro on its income tax return. On February 18, 1970, the district court entered a judgment for Gyro. Acquisition of Citrus Trees
Chris Mowry had been in the business of growing citrus fruit since he had planted citrus trees on property known as the Valley Center Ranch as early as 1956. During 1966, Chris Mowry approached Mr. Willie D. Waites (hereinafter referred to as *40 Waites), a nurseryman since 1942, for the purpose of acquiring citrus trees for planting on the Valley Center Ranch. Mowry and Waites reached an agreement whereby Waites would dig and deliver 2,250 trees to Mowry's ranch for $2.50 each. Waites finalized delivery of the trees approximately three weeks after their first meeting.Approximately twelve to fifteen trees that had been damaged in handling were replaced by Waites. He presented Mowry with a bill for the sale of the trees but Mowry refused to pay the bill as presented and demanded that Waites prepare a statement to the effect that Mowry was buying seedling trees and that Waites was growing the trees for Mowry. Mowry hoped to achieve certain tax benefits by having the transaction described in this manner. Because of his financial situation at that time, Waites agreed to prepare the statements even though he had reservations about preparing statements that he knew were false. During the trial of this case, Chris Mowry testified that he had arranged to buy seedlings and for Waites to grow the seedlings for him. He further testified that he first had contacted Waites prior to the budding of the trees. Transfer of Ranch to *41 Petitioner On January 1, 1965, Chris Mowry as seller and Gyro as buyer entered into a contract of sale for a parcel of the real property known as the Valley Center Ranch. The contract provided in part as follows: 1. The total purchase price for said property is Two Hundred and Fifty Thousand Dollars ($250,000.00) payable in principal installments of Ten Thousand Dollars ($10,000.00) to Seller on or before the last day of every year commencing in 1970, and continuing until the full amount of such purchase price together with interest from the date of this Contract on the remaining unpaid principal balance thereof at the rate of four percent (4%) per annum has been paid, not exceeding twenty-five years from 1970. Each such installment, when received by Seller, shall be credited to the reduction of the unpaid principal balance of such purchase price and interest on the amount so credited to payment on the principal balance of the purchase price shall thereon cease.
In addition to said principal installments, Buyer shall pay to Seller on or before the last day of each year commencing in 1965 interest on the remaining unpaid principal balance of such purchase price at the rate of *42 four percent (4%) per annum. * * * 5. Should Buyer fail to pay any amount to be paid by it pursuant to this Contract for taxes, assessments, or insurance within ten (10) days before such amount becomes delinquent, the Seller may pay such amount and the Buyer is obligated to repay to Seller on demand the amount so paid by Seller together with interest thereon from the date of payment by Seller to the date of repayment by Buyer at the rate of four percent (4%) per annum. 6. Destruction of, or damage to, any building or other improvement now or hereafter placed on said property, or of any personal property, if any, described in this Contract, whether from fire or any other cause, shall not release Buyer from any of its obligations under this Contract; it being expressly understood that Buyer bears all risk of loss to, or damage of, said property. * * * 8. Seller shall have the right to enter on and inspect said property and the buildings and improvements thereon at least once each calendar month. All repairs required on said property or the buildings and improvements thereon noted by Seller shall be made by Buyer, at its own cost and expense, within ten (10) days after *43 it receives notice in writing thereof from Seller. * * * 11. Buyer shall be entitled to enter into possession of said property on execution of this Contract and to continue in possession thereof so long as it is not in default in the performance of this Contract. 12. Payment of all moneys becoming due hereunder by Buyer and the performance of all covenants and conditions of this Contract to be kept and performed by Buyer are conditions precedent to the performance by Seller of the covenants and conditions of this Contract to be kept and performed by Seller. In the event Buyer shall fail for a period of fifteen (15) days after they become due to pay any of the sums in this Contract agreed to be paid by Buyer, either as installments or on account of interest, taxes, assessments, or should Buyer fail to comply with any of the covenants of conditions of this Contract on its part to be performed, then: (a) The Seller shall be released from all obligations in law or equity to convey said property to Buyer; (b) Buyer shall forfeit all rights to said property or to the possession thereof; (c) Seller shall have an immediate right to retake possession of said property; and *44 (d) Payments theretofore made by Buyer pursuant to this Contract shall be credited by Seller to the reasonable rental value of said property during the period Buyer had the use and occupancy of said property, and any excess of said payments over such reasonable rental value shall be refunded to Buyer. (e) In lieu of the foregoing, Seller, at his option, may declare, by notice to Buyer, the entire unpaid balance of the purchase price specified in this Contract to be due and payable, and may by appropriate action, in law or in equity, proceed to enforce payment thereof. (f) Any rights, powers or remedies, special, optional, or otherwise, given or reserved to Seller by this paragraph shall not be construed to deprive Seller of any rights, or powers, or remedies otherwise given by law or equity. 13. When the purchase price and all other amounts to be paid by Buyer pursuant to this Contract are fully paid as in this Contract provided, the Seller will execute and deliver to Buyer a good and sufficient deed conveying to Buyer good and marketable title to said property. * * * Petitioner paid $10,000 in 1965 and $10,000 in 1967 to Chris Mowry pursuant to the interest provision *45 of the contract.Petitioner paid an additional $10,000 in 1967 to Chris Mowry, which amount allegedly relates to interest for 1966 pursuant to the contract. Additions to Residences at Ranch In 1966 petitioner expended $4,927.91 for additions to the main residence and the foreman's residence at the Valley Center Ranch. A bedroom was added to the foreman's residence. The addition to the main residence consisted of an office, two store rooms, three additional bedrooms and a partial bath. Casualty Losses Three of the fourteen buildings comprising the Orange Grove Circle Apartment complex were built on caissons in an area where there is a ravine and about forty feet of fill. Because of extremely heavy rains, the buildings shifted unevenly causing the plaster to crack and the floors to become uneven. There was also glass breakage and some shifting and cracking of the foundations. An expert appraiser for the petitioner concluded that the amount of casualty loss sustained was $36,000. This estimate was not based on an appraisal as of 1966, the year when the damage occurred, but rather on a prior appraisal made seven years earlier. During the years 1966 and 1967, flooding occurred *46 in the area of the Valley Center Ranch. The flooding resulted in damage to a reservoir and to various citrus trees on the property. On its income tax return for 1967, petitioner claimed a deduction in the amount of $1,000 for the theft loss of a generator. Expenditures for Tractor Work and Concrete During 1965, 1966 and 1967, petitioner incurred expenses for tractor work in the amounts of $1,392.50, $2,057 and $1,011.50, respectively. The purpose of this tractor work was to change the course of a river that was threatening to destroy a road that was used for ingress and egress to the Valley Center Ranch. This work was performed on land that had been leased to Chris Mowry and his wife as individuals. They assigned this lease to petitioner on January 1, 1965. Furthermore, during 1966 and 1967, petitioner incurred expenses for concrete of $300.30 and $261.47, respectively. These amounts were expended in order to repair a concrete barrier that had been built across the river for the purpose of creating a road crossing. As a result of floods, this concrete had tilted and the pouring of new concrete was necessary so that the crossing would again be usable. Expenditures for *47 Petroleum Products and Vehicle Repairs Petitioner claimed deductions for oil and gas products and vehicle repairs in the amounts of $629.81 for 1964, $951.44 for 1965, $1,014.04 for 1966, $1,114.37 for 1967 and $1,375.62 for 1968. The entire amount claimed for 1964 and $600 of the amounts claimed in each of the remaining years was used to operate two automobiles used in petitioner's business. On various occasions, however, these cars were used for personal reasons. The remaining amounts were spent for weed oil at the ranch and for the ranch tractor. Expenditures Relating to Research Activities After 1952, Chris Mowry engaged in research in areas such as meteorology, long-range weather forecasting, electronic countermeasures, three dimensional color vision, hydraulic controls system and vibration mounts and insulations. The research equipment for this research was rather limited since most of the work was done on only a theoretical basis. No published works have resulted from Mowry's research. No income has been generated out of Mowry's research except for the sum of $1,000 received for forty hours of consultation at the rate of $25 per hour.
Rental Expense During its *48 taxable year ended October 31, 1965, petitioner claimed a deduction of $600 which was paid to Mowry for the use of part of a home that Mowry rented in San Diego. Addition to Tax Petitioner's income tax return for its taxable year ended October 31, 1963, was filed with the district director of internal revenue at Los Angeles on April 16, 1964. The due date for this return was January 15, 1964. Based on his determination that this income tax return was not timely filed and that the failure to file the return on time was not due to reasonable cause, the respondent imposed an addition to the tax for failure to file a timely return. OPINION Basis in Certain Apartment Properties The first issue is what is the petitioner's basis in apartment properties known as the Tropics, the Carousel and Orange Grove Circle. The petitioner contends that the respondent is precluded, under the doctrines of collateral estoppel or res judicata, from raising in the present case the issue of what is petitioner's correct basis in these apartment properties. In a prior litigation, the petitioner, after paying deficiencies pertaining to the years 1959 and 1960, filed a refund suit in Federal district *49 court. Petitioner contended that the properties were sold to it by Chris and Natalie Mowry for $3,164,000, which amount petitioner claimed as its basis for purposes of depreciation. The Government contended that the transaction was a sham and assigned to petitioner as its original cost basis the much lower remaining adjusted cost basis of the transferors. The district court held that the transaction was a sham. This decision was reversed and remanded by the Ninth Circuit. The district court thereupon entered a judgment for Gyro, based upon a stipulation submitted by the parties. We conclude that this prior litigation does not prevent the respondent from raising the issue of what is the basis of the apartment properties with regard to the years presently in issue. Under the doctrine of res judicata a final judgment on the merits of a cause of action binds the parties to the suit and those in privity with them, and prevents a further suit relating to issues that have been determined or could have been determined in the earlier suit with respect to the cause of action.Res judicata is not *50 applicable in the present case because it applies only when one seeks to litigate for a second time a settled cause of action. United States v. C.C. Clark, Inc., 159 F.2d 489 (C.A. 5, 1947). Taxes due for each tax year constitute separate and distinct causes of action even though the issues in each year may be identical.Respondent in the present case is litigating years subsequent to those previously litigated.
The doctrine of collateral estoppel applies to identical issues raised in separate causes of action. The judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. Cromwell v. County of Sac., 94 U.S. 351 (1876); Commissioner v. Sunnen, 333 U.S. 591 (1948). In the present case, the respondent has attempted to put in issue the basis of the apartment properties. Thus, the doctrine of collateral estoppel would preclude a determination of basis by this Court only if that issue was actually determined in the prior litigation. *51 The district court determined that the transaction in issue was a sham and requested that the parties prepare a judgment in accordance with that determination. The appellate court reversed and remanded the case after making its determination that the transaction was a valid sale. Thus, neither court made a determination as to the actual dollar amount of the basis in the properties. The petitioner contends that, in its pre-trial memorandum and in its appellate brief, it stated the issue as whether the $3,194,000 purchase price constituted its basis in the apartments. Neither the district court nor the appellate court, however, made a determination of this issue, nor were they required to do so. Upon remand, the district court entered a judgment based on a stipulation prepared by the parties. Such a judgment does not constitute a determination on the merits by the court. United states v. International Building Co., 345 U.S. 502 (1953); Massaglia v. Commissioner, 286 F.2d 258 (C.A. 10, 1961), affirming 33 T.C. 379 (1959). Thus, the doctrine of collateral estoppel does not preclude the respondent from raising the issue of what is the basis *52 of the apartment properties.Accordingly, we must determine the basis of these properties. With regard to the basis issue, the respondent contends in his amended answer that $749,000 of the $3,164,000 purchase price of petitioner's apartments was unstated or "built-in" interest. The respondent must carry the burden of proof on this issue. At the trial in this case, the respondent's expert witness repeated testimony previously given in the refund suit relating to the fair market value of the properties. It is the difference between the stated purchase price and the fair market value assigned by the respondent's expert witness that was described in respondent's amended answer as unstated interest. In his brief, respondent has further alleged that this difference may also be described as good will. Although we have carefully considered the testimony of respondent's expert witness, we conclude that respondent has failed to carry his burden of proof that the stated sale price did not establish the petitioner's basis in the property. In an attempt to show that the stated sale price in a transaction found by the Ninth Circuit to be a valid sale was not the fair market value of the *53 properties, the respondent has offered expert testimony that was based on approximations and an absence of comparable sales. Respondent's witness testified that he had viewed the properties only from adjacent streets. Furthermore, respondent has offered no proof regarding how this alleged difference between sale price and fair market value can be classified as either built-in interest or good will. We therefore hold that the basis of the apartment properties is the stated purchase price. We further hold that the testimony offered by petitioner's expert witness regarding an allocation of basis to the buildings located on each of the properties establishes a reasonable basis for each of the depreciable items. Acquisition of Citrus Trees
The next issue is whether the expenses incurred by petitioner during 1966 and 1967 for the acquisition of certain citrus trees are currently deductible as developmental and cultural care costs or whether they are nondeductible capital expenses. Although petitioner has conceded in his original brief that these expenses must be capitalized, Mowry testified during the trial that he had purchased tangelo seedlings from Waites and further contracted *54 with him for the maintenance, cultivation and budding of the seedlings until the trees were ready for transplanting to a grove. Waites testified that he sold transplantable citrus trees to Mowry.In view of Waites' testimony, we conclude not only that these expenses must be capitalized but also that Mowry's credibility as a witness was damaged by this testimony. Transfer of Ranch to Petitioner The next issue is whether petitioner is entitled to deductions for depreciation of the ranch that it allegedly purchased from Chris and Natalie Mowry. The petitioner contends that a sale of the ranch took place under state law and that the sale must be treated as a sale for tax purposes in accordance with Commissioner v. Brown, 380 U.S. 563 (1965), since the purchase price was within a reasonable range of the fair market value of the property. The respondent has made alternative arguments that would have the effect of denying the petitioner the full amount of depreciation deducted on its income tax returns. First, the respondent argues that the transaction in issue was a sham and that it should be treated as a contribution to capital rather than as a sale. Respondent's *55 alternative argument is that the petitioner holds no interest in the property that would entitle it to deduct depreciation. We assume that respondent did not intend to set forth his first argument in a manner that appears to contain inconsistent allegations. Respondent's argument that the transaction was in reality a contribution to capital presumes that the transaction was valid but puts in issue the manner in which the transaction should be treated for tax purposes. Thus, it appears that respondent intended his "sham argument" to be considered in connection with his argument that the petitioner had no depreciable interest in the property in issue.
Whether a transfer of property to a corporation by its shareholders is a sale or a contribution to capital is essentially a factual question. The nature of the transaction in issue must be determined from a consideration of all of the surrounding circumstances. Burr Oaks Corporation, 43 T.C. 635 (1965), affirmed 365 F.2d 24 (C.A. 7, 1966); Rowan v. United States, 219 F.2d 51 (C.A. 5, 1955); Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), *56 affirmed 254 F.2d 51 (C.A. 7, 1958). The above-cited cases list the several factors relevant in resolving whether a transaction is a sale or a contribution to capital. We believe that the factors set forth in the many cases concerning whether a transfer is a loan or a contribution to capital are also relevant to determination of the present issue since Gyro paid no immediate consideration for the Valley Center Ranch and thereby allegedly became indebted to the Mowrys. Although many factors would be relevant to resolving the present issue, we are able to analyze only a few of those factors because of the limited extent to which the parties have introduced evidence related to the transfer of the Valley Center Ranch. In support of his position, the petitioner, who must meet the burden of proof on this issue, has argued that a sale took place under California law, that the sale price was within a reasonable range of the fair market value and that the validity of the sale for tax purposes must therefore be recognized under the authority of Brown v. Commissioner, supra. We believe that petitioner's reliance on the Brown decision is misplaced. In Brown, the issue before *57 the Supreme Court was whether an alleged sale by the taxpayers of stock in a corporation owned substantially by them to a charitable organization was a valid sale for tax purposes when the charitable organization had no independent liability for the purchase price. We do not believe that the Supreme Court's construction of the term "sale" within the context of the factual situation therein was intended to serve as a guideline in determining whether a transfer of property by a shareholder to a corporation should be treated as a sale or a contribution to capital. The evidence presented by petitioner that the fair market value of the property in issue was close to the sale price is a factor in support of petitioner's contention that the transaction was a sale. This was the only evidence, however, presented by petitioner in support of his position. In contrast, the respondent has called to the attention of this Court several factors indicating that the transaction in issue was really a contribution to capital. No certificates of indebtedness were issued in connection with the installment sales contract so that the seller apparently maintained a status inferior to that of normal corporate *58 creditors, which is an indication that a transfer to a corporation by a shareholder was intended to be a contribution to capital. A.R. Lantz Co. v. United States, 424 F.2d 1330 (C.A. 9, 1970).Although the contract of sale required an annual interest payment by petitioner, in at least one year, no timely payment was made and the seller apparently made no effort to enforce such payment. Failure to make such payments when due indicates that the parties intended the corporation to pay interest only when high profits made in convenient for the corporation to do so. Gooding Amusement Co., 23 T.C. 408 (1954); Foresun, Inc., 41 T.C. 706 (1964). Furthermore, the sellers retained legal title to the property so that, in the event the corporation faltered, they could hold it free from the assets of the corporation. See Warren H. Brown, 27 T.C. 27 (1956). In view of these considerations, we hold that petitioner has failed to meet his burden of proof and that the transaction in issue constituted a contribution to capital. Having held that the transfer of the Valley Center Ranch was a contribution to the capital of the petitioner, we further *59 hold that the petitioner is not entitled to deduct as interest the payments in 1965 and 1967 which it has labeled as interest payments. Additions to Residences at Ranch The next issue is whether expenditures for additions to the main residence and the foreman's residence at the Valley Center Ranch should be added to the petitioner's cost basis. The respondent has challenged this addition by petitioner to cost basis on the grounds that these expenses were in the nature of personal, living or family expenses of Chris Mowry paid by the petitioner. A bedroom was added to the foreman's residence. The addition to the main residence consisted of an office, two store rooms, three additional bedrooms and a partial bath. We conclude that the additions to the foreman's residence and the addition of the office and the two store rooms to the main residence represent business expenses of the petitioner. We find, however, that the expenditures for the other additions to the main residence represent personal expenses of Chris Mowry. The cost of these additions was not allocated between the various rooms. Bearing heavily against the petitioner who has the burden of proof, we find that one-half *60 of the cost of these additions represent a business expense of the petitioner, which expense should be added to petitioner's cost basis. Casualty Losses The next issue is whether the petitioner sustained casualty losses from flood damages to the apartment properties in 1966, flood damages to the dam and citrus trees at the Valley Center Ranch in 1966 and 1967 and a theft of a generator in 1967. The respondent contends that deductions for these alleged losses should be disallowed because they are supported only by the testimony of Chris Mowry, who was not a credible witness. With regard to the apartment buildings, Chris Mowry testified that they were damaged by flooding from heavy rains in 1966. Mr. Vaughan, the petitioner's expert witness, testified that he made an exterior inspection of the buildings to determine the extent of damage and discovered that floors were uneven and that foundations had dropped and settled. Based on his opinion that the damage had decreased the value of the buildings by ten percent, he concluded that the damage to the buildings was $36,000. Mr. Vaughan used a previous appraisal made in 1959 as a basis for arriving at this amount. In view of *61 Mr. Vaughan's corroboration that damage occurred to the buildings, we conclude that the petitioner sustained a casualty loss in 1966. We find that the amount of damage incurred was $20,000.In arriving at this figure, we have taken into account that the appraisal of the petitioner's expert witness was based on a casual observation of the properties in issue and that the prior appraisal had been made seven years before the damage occurred. The petitioner also contends that it sustained losses of $4,200 in each of the years 1966 and 1967 as a result of flood damage to the dam at the Valley Center Ranch. The estimate of the amount of loss was determined by Mr. Vaughan on the basis of information supplied to him by Mowry. Mr. Vaughan estimated that the total reduction in value of the reservoir was $8,400. Mr. Vaughan arbitrarily allocated this amount equally to the two years in issue. We conclude that with regard to this particular casualty loss, the testimony of Mowry and the expert witness is sufficient to establish that the petitioner suffered a casualty loss as a result of flood damage to the dam. Bearing heavily against the petitioner who has the burden of proof and considering *62 the limited evidence introduced regarding the extent of the damage, we find that the flooding damage to the reservoir was $1,000 in each of the years 1966 and 1967. Petitioner further contends that it sustained casualty losses in the amounts of $1,940 and $970 in 1966 and 1967, respectively, as a result of flooding damage to citrus trees. The evidence supporting this allegation consisted of Mowry's testimony regarding the circumstances causing the flood damage and the number of trees damaged and of Mr. Vaughan's opinion, based on information provided him by Mowry, of the amount of the loss. We conclude that the testimony presented regarding this particular issue is sufficient to establish that a loss was incurred. Having carefully considered the limited evidence presented and bearing heavily against the petitioner who has the burden of proof, we find that the loss in 1966 was $1,000 and in 1967 was $500. Petitioner alleges that it sustained a theft loss of $1,100 in 1967 as the result of the theft of a generator. The only evidence supporting this contention was the testimony of Chris Mowry. He stated that he was not certain that the theft occurred in 1967. He stated that *63 he reported the theft to the San Diego police department, but no documentary evidence was introduced to support this statement. He further testified as to the cost of the generator and repairs to it.This testimony, however, was not supported by a receipt or bill of sale. Having found that petitioner has not presented sufficient evidence to establish that a theft loss occurred, we conclude that the petitioner is not entitled to a casualty loss deduction as the result of the alleged theft loss of a generator. Expenditures for Tractor Work and Concrete The next issue is whether the petitioner is entitled to a deduction for amounts expended for tractor work and for concrete, which expenses related to a road that crossed land leased by petitioner and that permitted ingress and egress to the Valley Center Ranch. The lease of this property expired in about 1972. Petitioner argues that this deduction is allowable under section 165 as a casualty loss, under section 175 as a soil conservation expense or under section 162 as a repair. We hold that petitioner is entitled to a deduction under section 165 for those expenses relating to the pouring of concrete to repair the damage to the *64 concrete crossing caused by flooding. Citing Bonney v. Commissioner, 247 F.2d 237 (C.A. 2, 1957), affirming Samuel Towers, 24 T.C. 199 (1955), the respondent argues that a short-term lessee such as Gyro cannot take a casualty deduction for repairs made when it was not legally obligated to make repairs. Respondent's reliance on Bonney is misplaced. The deduction was denied in that case because the taxpayer had relied on the cost of repairs as a measure of the casualty loss. In the years in issue therein, cost of repairs was not acceptable for measuring a casualty loss. Under section 1.165-7(a) (2) (ii), Income Tax Regs., however, cost of repairs is now an acceptable method for determining loss in certain situations. We find that the costs of pouring concrete to repair the crossing is acceptable as evidence of loss of value pursuant to section 1.165-7(a) (2) (ii), Income Tax Regs.
With regard to the tractor work performed in order to change the course of a river and prevent it from destroying the road, we find that such work did not relate to the repair of a casualty loss but rather constituted an improvement. *65 Accordingly, these expenses are not deductible pursuant to section 165. We further hold that the costs of the tractor work are not deductible pursuant to section 175 as a soil and water conservation expense because they were not incurred for the prevention of erosion of land "used in farming" as required by that section. Petitioner also argues that these expenses of tractor work are deductible under section 162 as ordinary repairs. We conclude that these expenses were not incurred for the purpose of ordinary repairs but rather were incurred to create a permanent improvement. In view of the short-term nature of the lease in issue, we hold that the costs of tractor work must be capitalized over the term of the lease. Expenditures for Petroleum Products and Vehicle Repairs The next issue is whether the petitioner is entitled to the deductions it claimed for oil and gas products and for vehicle repairs. The amounts claimed as deductions were $629.81 for 1964, $951.44 for 1965, $1,014.04 for 1966, $1,114.37 for 1967 and $1,375.62 for 1968.Mowry testified that $629.81 for 1964 and about $600 for each of the remaining years was spent to operate the two automobiles used in petitioner's *66 business. He admitted, however, that on various occasions he used the cars for his personal use.He stated that the expenditures in excess of $600 for the years 1965 through 1968 were spent for weed oil at the ranch and for the ranch tractor. Taking into account that Mowry admitted using the cars for personal reasons and that no records were introduced to separate business and personal use of the cars, we find that petitioner is entitled to deductions of $530 for 1964, $850 for 1965, $900 for 1966, $1,000 for 1967 and $1,270 for 1968. Expenditures Relating to Research Activities The next issue is whether petitioner may deduct as either trade or business expenses or as a research and experimental expense certain amounts that it allegedly spent in connection with research activities conducted on its behalf by the petitioner's president. These amounts, which were claimed on petitioner's returns as repairs and maintenance, were expended for airplane fares, travelers checks, office supplies, books, attorney's fees and miscellaneous items. The parties have stipulated the precise amounts of these items. In order to deduct the amounts in issue as trade or business expenses pursuant *67 to section 162, the petitioner must show that it was engaged in the trade or business of research and inventing. To qualify as a trade or business, there must exist both activities engaged in as a business and a profit motive. International Trading Co. v. Commissioner, 275 F.2d 578 (C.A. 7, 1960). We conclude that petitioner has failed to prove either of these factors.Although petitioner was originally organized to produce and market scientific equipment, it ceased this activity shortly after organization. After several years of dormancy, the petitioner engaged in managing apartments and growing oranges. It was from these activities that petitioner realized its income and to which it devoted its energies. We reject petitioner's contention that it was also engaged in the trade or business of inventing and research. Although it appears that Mowry engaged in research of a theoretical nature in diverse areas, petitioner has failed to establish that it hired Mowry to perform this research with a view to developing and producing products or even selling inventions. The only *68 income derived from these activities was $1,000 that Mowry received as a consulting fee. Furthermore, petitioner maintained only the most limited of research facilities and contends that Mowry was able to conduct his research in his mind.It appears to us that Mowry carried on theoretical research as a hobby and that petitioner, which was controlled by Mowry, was simply financing this hobby. Petitioner further argues that it is entitled to deduct these expenses pursuant to section 174, which allows a deduction for research or experimental expenditures incurred "in connection with his trade or business." Citing Best Universal Lock Co., 45 T.C. 1 (1965), the petitioner contends that these expenses are deductible even though they are unrelated to current product lines. The respondent argues that the petitioner has not established that the expenses in issue were incurred "in connection with his trade or business." We conclude that the present factual situation is distinguishable from that in Best Universal Lock Co., supra, in which this Court found that certain *69 research projects were an integral and bona fide part of the corporation's trade or business. We have made no such finding in the present case. The Supreme Court, however, has held that the phrase "in connection with any trade or business" is broader than the phrase "trade or business" used in section 162. Snow v. Commissioner, 416 U.S. 500 (1974). Thus, in Snow a deduction was allowed to a partnership that was actively developing an incinerator for the purpose of profitably marketing it even though the partnership was not yet producing any products. In the present case, however, the petitioner has not carried its burden of proving that it was carrying on research for the purpose of developing a product and making a profit. Thus, the present case is also distinguishable from Snow. Having determined that the amounts allegedly spent for research activities are not deductible pursuant to either section 162 or section 174, it is unnecessary to consider respondent's alternative argument that certain of these amounts must be capitalized. Rental Expense The next issue is *70 whether petitioner is entitled to deduct as a rental expense $600 that it allegedly paid to Mowry in 1965 for use of part of his rented home as a research facility. The only evidence presented on this issue was the self-serving and uncorroborated testimony of Mowry. No descriptions of the type or extent of research performed in the rented home were offered. We hold that petitioner has failed to carry its burden of proof on this issue, and that the petitioner is not entitled to this rental deduction. Even if we were to find that Mowry actually conducted research in the rented home, we would nevertheless deny the deduction for the same reasons that we have denied deductions of other amounts that petitioner spent in connection with research activities conducted by Mowry. Addition to Tax The next issue is whether petitioner is liable for the addition to tax for failure to file a timely return provided for in section 6651(a). Petitioner contends that it is not liable for this addition to tax because its failure to file was due to reasonable cause and not due to willful neglect. Mowry testified that, because of illness, he applied for an automatic extension of the time within *71 which to file a return. The respondent contends that he has no records of such an application and that the application may have been returned to the sender because it was incomplete. In support of Mowry's testimony, the petitioner presented the application for an extension of time that was filed with the State of California at the same time the Federal application was allegedly filed. The petitioner also presented a return receipt for registered mail postmarked January 16, 1964, and stamped as received by the district director of internal revenue on January 16, 1964.
Section 6081(b) provides that an extension of three months for the filing of a return shall be allowed any corporation if it files the form prescribed by the Secretary or his delegate in such manner and at such time as the Secretary or his delegate prescribes. The petitioner contends that it properly filed this form; the respondent contends that the form was not properly filed. The petitioner relies on the theory that the respondent has lost the properly filed form. The respondent theorizes that the form probably was filed *72 but that it was returned because it was incomplete. Either theory is plausible; however, the automatic extension is allowed only if the taxpayer complies with the procedures prescribed by the Secretary or his delegate and the burden of proving such compliance is on the petitioner. In view of the failure of petitioner's president to produce a copy of the form allegedly filed and of his apparent inaction when he did not receive anything back from the respondent, we hold that petitioner has not shown reasonable cause for failure to file by reason of having gained an automatic extension of time to file. We must further consider, however, petitioner's contention that its president was unable to file because of ill health. Illness is "reasonable cause" if it can be shown that the taxpayer is prevented from filing a timely return because of such illness. Alma Williams, 16 T.C. 893, 906 (1951). The only evidence presented regarding the health of petitioner's president was his testimony that he was sick and that he had had heart trouble. Mowry did not present any details about his illness. Furthermore, no statements from physicians or medical records were offered into *73 evidence. Accordingly, we find that petitioner has failed to prove that illness of its president was a reasonable cause for failure to file. We hold that petitioner is liable for the addition to tax provided by section 6651(a). Decisions will be entered under Rule 155.